

RECEIVED AK
7/26/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**PUBLIC RECORD VERSION OF THE DOCUMENT FILED UNDER
SEAL PURSUANT TO LR 26.2 (C)**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | | |
|---|---|---|
| **Dr. Satyanarayan Hegde, M.D.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No: 1:21-cv-2979** |
| | ) | |
| **Advocate Health and Hospitals** | ) | **JUDGE MARY M. ROWLAND** |
| **Corporation,** | ) | |
| **Shimoni Dharia, M.D. in her personal** | ) | |
| **capacity** | ) | **JURY DEMANDED** |
| **Nancy Mathieu in her personal capacity** | ) | |
| **Emilee Gabrielson in her personal** | ) | |
| **capacity** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

**NOW COMES** Plaintiff, DR. SATYANARAYAN HEGDE, acting *Pro Se*., and as his First Amended Complaint against Defendants, ADVOCATE HEALTH AND HOSPITALS CORPORATION, SHIMONI DHARIA, M.D., NANCY MATHIEU, AND EMILEE GABRIELSON states as follows:

### NATURE OF THE ACTION

This is an action for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII"), Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"), Age Discrimination in Employment Act, 29 U.S.C. §623 et. seq. ("ADEA"), 815 ILCS 505/2; Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud"), Defamation Per Se, and Illinois Common Law Fraud.

### JURISDICTION, VENUE AND JURY DEMANDS

1.      Plaintiff invokes the jurisdiction of this Court pursuant to 42 U.S.C. § 1981 and 28 U.S.C.A. § 1331.

2.      Venue is proper in the Northern District of Illinois, Eastern Division as the alleged acts occurred herein.

3.      Plaintiff demands a trial by jury.

### THE PARTIES

4.      Plaintiff, DR. SATYANARAYAN HEGDE, is a resident of Gainesville, Florida.

5.      Defendant, ADVOCATE HEALTH AND HOSPITALS CORPORATION ("ADVOCATE"), is a hospital incorporated in Oak Lawn, Illinois.

6.      Defendant, SHIMONI DHARIA ("DHARIA") is a person & a physician

administrator, based in Oak Lawn, Illinois who was the key decision maker at all times that formed the basis of this suit.

7.      Defendant NANCY MATHIEU ("MATHIEU") is a person & a physician recruiter for Defendant "ADVOCATE" based in Oak Lawn, Illinois.

8.      Defendant EMILEE GABRIELSON ("GABRIELSON") is a person & a physician recruiter for Defendant "ADVOCATE" based in Oak Lawn, Illinois.

## SHORT AND PLAIN STATEMENT OF FACTS

At least since May 2019 and at least until October 2020, ADVOCATE was openly advertising for a physician job for which the plaintiff was qualified. Plaintiff belonged to several protected classes and repeatedly applied for the position from May 2019 until March 2021. Defendant ADVOCATE rejected plaintiff's applications at all times and finally hired a less qualified, less experienced candidate who ███████████████████ ████████████████████████████. Despite multiple good faith efforts on the part of the plaintiff, ADVOCATE refused to share the reason for rejecting plaintiff, or whom it had hired for the position. Only after filing this complaint, ADVOCATE shared that it had hired a candidate who happened to be outside the protected classes of plaintiff. ADVOCATE further shared that certain beliefs held by Defendants DHARIA, MATHIEU and GABRIELSON, were the reasons for not hiring the plaintiff.

## GENERAL ALLEGATIONS

1.      Plaintiff is 53 years old. His national origin is Indian. He has suffered from several disabilities at all relevant times including but not limited to vocal cord paralysis, paralysis of one of the diaphragms and a weak lung.

2.      Plaintiff was previously involved in protected activities including but not limited to filing charges with the EEOC against different employers.

3.      The information on plaintiff's age, disability status and prior EEOC charges are available in the public domain and also easily accessible on the internet to all defendants.

4.      In or around March 2018, ADVOCATE merged two campuses of its children's hospitals and appointed DHARIA as the chief of Pediatric Pulmonology after an internal search.

5.      Sometime between March 2018 & May 2019, ADVOCATE's various departments including Pediatrics, Finance, Physician Compensation, Physician Recruitment and Marketing approved the new position, prepared marketing materials, and began an advertisement campaign.

6.      ADVOCATE gave the sole authority of screening all new pediatric pulmonology physician applicants for its clinical enterprise to DHARIA.

7.      In May, 2019 in response to ADVOCATE's advertisement campaign, Plaintiff applied for a Pediatric Pulmonologist Physician position ("Position") with ADVOCATE for the first time.

8.      In response to ADVOCATE's ongoing advertisement campaign, Plaintiff applied for the "Position" on multiple occasions, including in May 2019, June 2019, July 2019, September 2019, February 2020, August 2020, October 2020, and March 2021.

9.      ADVOCATE uses a "phone screening process" to triage its physician applicants.

10.     In or around May 13, 2019, DHARIA called the plaintiff on his cell phone as part of this "phone screening process".

11.     During this "phone screening process", DHARIA created a belief in her mind that the plaintiff did not have enough experience in cystic fibrosis and that the plaintiff was asking for remote call coverage from Florida.

12.     During this "phone screening process", DHARIA did not ask any questions related to ADVOCATE's need for or plaintiff's prior experience in, cystic fibrosis.

13.     DHARIA did not create or maintain any records about this "phone screening process" that she used on the plaintiff.

14.     Solely based on the beliefs that she created in her mind in or around May 13, 2019 during the "phone screening process", DHARIA, disqualified plaintiff for the position at ADVOCATE.

15.     DHARIA or ADVOCATE did not communicate their dispositive decisions about plaintiff's disqualification, nevertheless, asked the plaintiff to forward his CV to their physician recruiter, MATHIEU.

16.     On May 14 2019, through an email, plaintiff forwarded his CV to the physician recruiter MATHIEU which MATHIEU ignored.

17.     Between June 18 & July 22, 2019, plaintiff sent multiple follow up emails to Ms. MATHIEU requesting response on his application which Ms. MATHIEU ignored.

18.     DHARIA's beliefs that she created in her mind on May 13, 2019 were false and pretextual because, plaintiff had plenty of experience in cystic fibrosis and the plaintiff did not request for remote call coverage from Florida.

19.     Plaintiff's cystic fibrosis experience was also evident on his CV that was forwarded to ADVOCATE on May 14, 2019, the day after DHARIA's "phone screening process".

20.     Sometime between May 2019 & July 2019, DHARIA created another belief in her mind that the plaintiff had an aggressive behavior.

21.     DHARIA's beliefs on plaintiff's behavior were false & pretextual because the plaintiff was and is not aggressive.

22.     Plaintiff has always been a pleasant, friendly, calm, warm, peaceful, approachable, hospitable, kind, helpful and a good physician.

23.     DHARIA is a licensed physician in Illinois, board certified in the field of pediatric pulmonology.

24.     Based on her qualifications and training in pediatric pulmonology, DHARIA knew or should have known that she was not qualified to make behavioral assessments of physicians.

25.     Based on her lack of qualifications and training in behavioral assessment of physicians, DHARIA knew or should have known that she should not have assessed the behavior of the plaintiff.

26.     DHARIA graduated from the Chicago Medical School at Rosalind Franklin University, which is accredited by Liaison Committee on Medical Education (LCME).

27.     LCME accredited medical schools mandate its medical students to complete a curriculum on psychiatry before they can take qualifying exams.

28.     DHARIA has completed a psychiatry curriculum education in an LCME accredited medical school.

29.     The psychiatry curriculum teaches medical students on the validated methods and tools used in behavior assessments.

30.     During her medical school, DHARIA was taught or should have been taught on the validated tools and methods of behavioral assessments.

31.     DHARIA completed a three year pediatric residency at ADVOCATE Hope Children's Hospital, which is accredited by the Accreditation Council for Graduate Medical Education (ACGME).

32.     ACGME accredited pediatric residency programs teach their residents on the validated tools and methods to assess behaviors.

33.     During ADVOCATE's pediatric residency training, DHARIA was taught or should have been taught on the validated tools and methods of behavioral assessments.

34.     To continue to maintain her active medical license, DHARIA is required to participate in various Continuing Medical Education (CME) activities on a regular basis.

35.     The CME's offer education in all fields including the areas of human behaviors and on validated behavior assessment tools and methods.

36.     DHARIA had opportunities to learn about validated behavior assessment tools and methods through CME's.

37.     The "phone screening process" that ADVOCATE uses to screen physicians is not a validated tool or method to assess the behaviors of physicians or physician applicants.

38.     DHARIA knew or should have known that she could not and cannot use the unvalidated "phone screening process" to assess the behavior of the plaintiff.

39.     Other than a brief phone call on May 13, 2019 as part of ADVOCATE's "phone screening process", DHARIA did not have, and could not perceivably have had any firsthand interaction with the plaintiff.

40.     Between May 14, 2019 and March 2021, plaintiff sent several follow up emails to ADVOCATE requesting status updates on his application and reapplying for "the position". DHARIA solidified her beliefs that plaintiff's behaviors were aggressive, solely based on the readings of plaintiff's emails.

41.     DHARIA knew or should have known that she could not and cannot assess the behaviors of physician applicants or plaintiff by just reading the emails.

42.     DHARIA knew or should have known that she could not and cannot assess the behaviors of physician applicants by a combination of unvalidated "phone screening process" and reading of emails. Yet, solely based on such combination, DHARIA created and solidified beliefs in her mind that the plaintiff's behaviors were aggressive.

43.     Solely based on her such beliefs, DHARIA refused to review the CV of the plaintiff or reconsider plaintiff's application when he repeatedly reapplied.

44.     DHARIA is not qualified to make behavioral assessments on physician applicants or the plaintiff.

45.     Even if qualified to assess behaviors on physician applicants or the plaintiff, DHARIA did not use a validated method or tool to assess plaintiff's behavior.

46.     DHARIA used an unvalidated behavior assessment tool solely to eliminate the plaintiff from the physician applicants' pool on pretextual grounds.

47.     DHARIA did not create or maintain any records on the "phone screening process", review of emails, or on the behavior assessments that she conducted on the plaintiff or any other physician applicants.

48. DHARIA's lack of record maintenance relating to ADVOCATE's "phone screening process", her review of emails, or on the behavior assessments that she conducted on the plaintiff or any other physician applicants is solely to hide her true intent.

49. Between July 2019 and March 2021, DHARIA solidified her beliefs that a) the plaintiff was asking for remote call coverage from Florida, b) the plaintiff did not have enough cystic fibrosis experience, and c) the plaintiff had aggressive behavior not compatible with the behavioral expectations of ADVOCATE.

50. Because of her solidified beliefs about plaintiff's aggressive behavior, DHARIA blocked all opportunities to correct her beliefs about plaintiff's cystic fibrosis experience or plaintiff's alleged request for remote call coverage from Florida.

51. Because of her solidified beliefs that the plaintiff had aggressive behavior, DHARIA refused to review plaintiff's CV.

52. Had DHARIA reviewed plaintiff's CV, her belief about plaintiff's lack of cystic fibrosis experience would have been corrected.

53. Because of her solidified beliefs about plaintiff between July 2019 & March 2021, DHARIA refused to re-evaluate plaintiff's candidacy whenever he reapplied.

54. Had DHARIA re-evaluated plaintiff's candidacy, her belief about plaintiff's alleged request for a remote call coverage from Florida would have been corrected.

55. DHARIA's refusal to re-evaluate plaintiff's candidacy was solely to eliminate plaintiff from the physician applicants' pool on pretextual grounds.

56. DHARIA refused to allow her beliefs to be corrected solely to eliminate plaintiff from the physician applicants' pool on pretextual grounds.

57. MATHIEU was a physician recruiter for ADVOCATE for "the position" between May 14 & July 22, 2019.

58. In her job, either ADVOCATE does not give, or MATHIEU does not have, enough time to answer phone calls or return calls to messages from physician applicants.

59. Between May 14 & July 22, 2019, MATHIEU had received three audio voice messages on her office phone's answering system from the plaintiff.

60. MATHIEU believes the audio voice messages contained assertions from the plaintiff about his qualifications, experience, his suitability for "the position", and why he should be hired by ADVOCATE.

61. MATHIEU does not like any assertions from physician applicants and likes only "the process" at ADVOCATE to play out.

62. At all times, MATHIEU had no direct interaction with the plaintiff.

63. Solely based on offline listening to plaintiff's three audio voicemail messages, MATHIEU conducted behavioral assessment on the plaintiff.

64. MATHIEU does not have any qualifications, experience, or expertise to conduct behavior assessment of physicians or physician applicants.

65. Based on her behavior assessment on the plaintiff, MATHIEU created a belief in her mind that, the plaintiff was aggressive.

66. Based on her personal belief, MATHIEU shared with and make DHARIA believe that the plaintiff was aggressive.

67. Sometime on or around July 22, 2019 upon promotion of MATHIEU, GABRIELSON assumed the MATHIEU's role as a physician recruiter for "the position".

68. On or around September 9, 2019, GABRIELSON conducted plaintiff's phone interview for "the position" being advertised by ADVOCATE.

69. Other than this phone interview and some email exchanges, at all times, GABRIELSON had no direct interaction with the plaintiff.

70. By training, experience, or expertise, GABRIELSON has no qualifications to conduct behavior assessments on the plaintiff or any physician applicants.

71. Using the same methodology adopted by DHARIA & MATHIEU, GABRIELSON allegedly conducted plaintiff's behavior assessment.

72. Based on her behavior assessment, GABRIELSON allegedly believed that the plaintiff had aggressive behavior and shared her such beliefs with DHARIA.

73. DHARIA, MATHIEU and GABRIELSON formed, nurtured, solidified, and exchanged beliefs among themselves and their supervisors that the plaintiff had aggressive behavior

74. Because of their beliefs that the plaintiff had aggressive behavior, DHARIA, MATHIEU and GABRIELSON further believed that the plaintiff lacked ability or integrity to perform his job duties at ADVOCATE.

75. DHARIA, MATHIEU and GABRIELSON made statements to ADVOCATE to prejudice plaintiff in his profession or business.

76. Solely because of the statements made by DHARIA, MATHIEU and GABRIELSON about plaintiff's alleged lack of ability or integrity to perform his job duties at ADVOCATE, ADVOCATE refused to hire the plaintiff.

77. ADVOCATE evaluated at least five other physician applicants who except one are all believed to be under 40 years of age.

78. All applicants other than the plaintiff are believed to not have disability and not previously have filed any EEOC complaints.

79. Plaintiff is believed to be the only candidate to have been disqualified in the initial "phone screening process".

80. Every candidate in the applicant pool under the age of 40, who is not disabled and who did not file any prior EEOC complaint, is believed to have been advanced or given an opportunity for advancement to the stage beyond the initial "phone screening process" of ADVOCATE's physician recruitment.

81. On or around █████████, a hitherto new candidate named Z.A. applied for "the position".

82. ADVOCATE treated Z.A. more favorably than plaintiff at all stages of the application.

83. Sometime between ████████████████████████ ████████████████ for Z.A.

84. At the time of their ███████████████, Z.A. was still in training as a pediatric pulmonary fellow.

85. ████████████████████████████ minimum qualifications for "the position".

86. Sometime between ██████████████████████ ████████████████████████████

87. However, in its certification made under an oath of perjury to this court on October 13, 2021, ADVOCATE stated that it did not ask applicants to disclose their age or disability status during the application process.

88. Z.A. was born in ███████ race and was approx. ██ years old in October 2020.

89. Sometime between ██████████████████████, GABRIELSON & MATHIEU began ████████████████████ Z.A.

90. Sometime between █████████████████████, GABRIELSON ████████████████████████████████████████████████████ ██████████████████.

91. On or around October 8, 2020, GABRIELSON on behalf of ADVOCATE placed a new advertisement for "the position" on an internet job board called, "Practicelink".

92. On or around October 14, 2020, by way of an email to DHARIA and GABRIELSON, plaintiff re-applied for "the position" in response to the above advertisement. On the same day, plaintiff also filed a complaint of unlawful discrimination and other wrongful acts through ADVOCATE's compliance hotline.

93. At 9:25am Eastern (8:25am Central) on October 15, 2020, GABRIELSON emailed plaintiff stating, "Good morning, Dr. Hedge, Thank you for your continued interest. At this time, we have offered the position to another candidate."

94. However, ADVOCATE had not ████████████████████████ ████████ on October 15, 2020 contrary to GABRIELSON's statement.

95. On or around October █████████████████████████ after GABRIELSON's claim that the position had already been offered to another candidate, ADVOCATE ████████████████████████████████ ███████████████████.

96. On October 14, 2020, ███████████████████, GABRIELSON noted, "██████████████████████████████████████████ ████████████████████████████████████████."

97. On or around November 6, 2020, ███████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████

98. As of October 2021, ADVOCATE has paid ████████████ ███████████████████████████████ ███████████████████████████████ █████████████████".

99. ███████████████████████████ in comparison to plaintiff.

100. ███████████████████████████ while the plaintiff is board certified.

101. ███████████████████████████ while the plaintiff had more than 10 years of experience as a pediatric pulmonologist.

102. ███████████████████████████████████ while, plaintiff had several years of experience in cystic fibrosis.

103. Prior to their hiring at ADVOCATE, ███████████████ ████████████████████████████████ while the plaintiff was never placed on ██████ in his entire career.

104. "The position" for which Z.A. was hired and the plaintiff was rejected, is a clinical position with no expectations or support for research.

105.    To overcome the ███████████████████████████████████

████████████████████████████████████████████████████████████████

███████ from ADVOCATE.

106.    The ADVOCATE's physician DHARIA solicited information from, was the

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████

107.    The three physicians from the "other hospital" happened to be ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████.

108.    On or around February 16, 2021, plaintiff filed another complaint alleging

unlawful discrimination and other civil wrongs using ADVOCATE's compliance hotline.

109.    ADVOCATE has not investigated plaintiff's October 14, 2020 or February 16,

2021 complaints made to ADVOCATE's compliance hotline.

110.    On or around March 15, 2021, Z.A. began working for ADVOCATE.


**COUNT I: DEFAMATION PER SE & DEFAMATION PER QUOD (AGAINST**

**DEFENDANTS ADVOCATE, DHARIA, MATHIEU & GABRIELSON)**

111.

112.    Plaintiff realleges and incorporates ¶¶ 1-110 of General Allegations as ¶111 of

Count I

113.     Defendants DHARIA, MATHIEU & GABRIELSON formed false beliefs and stated that plaintiff had an aggressive behavior which is false.

114.     Defendants DHARIA, MATHIEU & GABRIELSON stated that plaintiff lacked ability or integrity to perform job duties due to aggressive behavior at ADVOCATE and hence repeatedly eliminated plaintiff from their applicant pool.

115.     On the face of it, DHARIA, MATHIEU & GABRIELSON's statements were harmful to the plaintiff and constitute defamation per se.

116.     Solely because of the defamatory statements of defendants DHARIA, MATHIEU & GABRIELSON, plaintiff has suffered damages.

117.     The statements made by defendants DHARIA, MATHIEU & GABRIELSON on plaintiff's behavior constitute defamation per quod.

118.     Defendant ADVOCATE knew or should have known that DHARIA, MATHIEU & GABRIELSON were committing defamation per se and yet failed to take any corrective action.

119.     Defendant ADVOCATE knew or should have known that DHARIA, MATHIEU & GABRIELSON were acting outside the scope of their employment when making defamatory statements against plaintiff and yet ADVOCATE failed to take any corrective action.

120.     Plaintiff discovered defamation for the first time on May 20, 2022 during the depositions of DHARIA & MATHIEU and the plaintiff could not have discovered the defamation prior to May 20, 2022.

121.     The defamation began sometime on or around May 13, 2019 and is ongoing.

122.     Defendant ADVOCATE is liable for the actions of DHARIA, MATHIEU & GABRIELSON.

## COUNT II – COMMON LAW FRAUD (AGAINST DEFENDANTS ADVOCATE, DHARIA, MATHIEU & GABRIELSON)

123.

124.     Plaintiff realleges and incorporates ¶¶ 1-122 of General Allegations as ¶123 of Count II

125.     The elements of fraud under Illinois Common Law include: (a) a false statement of material fact; (b) the defendant's knowledge or belief that the statement was false; (c) the defendant's intent that the statement induce the plaintiff to act or refrain from acting; (d) the plaintiff's justifiable reliance upon the truth of the statement; and (e) damages resulting from the plaintiff's reliance on the statement.

126.     **Defendants made false statement of material fact about the qualification criteria for the job.**

   a.  In their advertisement, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON claimed that qualified candidate should have completed an American Board of Pediatrics (ABP) accredited fellowship in Pediatrics and Pulmonary and B.E. or B.C. by the ABP in this subspecialty.

   b.  Defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON advanced the candidate ███████████████████████████████████████

████████████████████ while they refused to advance plaintiff who had completed his fellowship and was already B.C. by the ABP in the specialty.

c. Defendants DHARIA, MATHIEU & GABRIELSON claimed "CF experienced physician" was a qualification criteria.

d. Defendants DHARIA, MATHIEU & GABRIELSON refused to consider plaintiff's CF experience evident in his CV and advanced a candidate who ████ ███████████.

e. In their advertisement, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON claimed experience in satellite clinics, highly complex inpatient service, program development, teaching, faculty development and research as other qualification criteria ("Additional Qualifications")

f. Defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON refused to consider plaintiffs "Additional Qualifications" and advanced a candidate ████ ███████████████████".

g. In their advertisement, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON claimed their support for "managing the changing healthcare landscape", "advances in technology" and "innovative approaches" to provide impeccable outcomes for their patients.

h. However, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON refused to support plaintiff's proposal for "managing the changing healthcare landscape", "advances in technology" and "innovative approaches" to provide impeccable outcomes for their patients.

i.  Defendants DHARIA, MATHIEU & GABRIELSON deliberately withheld the information from plaintiff about their alleged need for a CF experienced physician.

j.  Defendants DHARIA, MATHIEU & GABRIELSON deliberately withheld information from plaintiff about their changed need for a CF experienced physician.

127.    **Defendants made false statements of material fact about plaintiff.**

a.  Defendants DHARIA, MATHIEU & GABRIELSON claimed plaintiff did not have qualifications and hence refused to advance him in their application process.

b.  In order to support their claim, defendants DHARIA, MATHIEU & GABRIELSON formed and exchanged false beliefs & opinions among themselves and with their supervisors.

c.  Defendants DHARIA, MATHIEU & GABRIELSON refused to review plaintiff's CV on multiple occasions.

d.  By such refusal, defendants DHARIA, MATHIEU & GABRIELSON formed a false belief that plaintiff did not have enough CF experience.

e.  In order to make false statements, defendants DHARIA, MATHIEU & GABRIELSON created false records about plaintiff.

f.  In their records, defendants DHARIA, MATHIEU & GABRIELSON falsely claimed that plaintiff was asking for a remote call from Florida.

g.  Defendants DHARIA, MATHIEU & GABRIELSON used such false records to disqualify plaintiff.

h. Defendants DHARIA, MATHIEU & GABRIELSON displayed deceptive conduct.

i. Defendants DHARIA, MATHIEU & GABRIELSON's deceptive conduct was pervasive and was only discovered during the discovery of this lawsuit.

j. By way of an example in or around February 2020 in their feedback to plaintiff, defendants DHARIA, MATHIEU & GABRIELSON claimed plaintiff's alleged lack of CF Experience as the reason for disqualifying him.

k. However, in their records, they had falsely claimed that the plaintiff was seeking remote call from Florida.

l. Defendants DHARIA, MATHIEU & GABRIELSON suppressed their records containing false information from the plaintiff.

m. Defendants DHARIA, MATHIEU & GABRIELSON created false beliefs in their minds that plaintiff was aggressive even though they had no firsthand information on plaintiff's behavior.

n. Based on such false beliefs, defendants DHARIA, MATHIEU & GABRIELSON justified their decision to disqualify plaintiff from the application process.

o. Based on such false beliefs, defendants DHARIA, MATHIEU & GABRIELSON made false statements to this court and unknown others that plaintiff had aggressive behavior.

128. **Defendant Advocate made a false statement of material fact that it would investigate plaintiff's compliance hotline complaints.**

a. In October 2020 and February 2021, plaintiff made complaints against defendants DHARIA, MATHIEU and GABRIELSON using Advocate's compliance hotline.

b. Defendant ADVOCATE promised to investigate plaintiff's hotline complaints, however ADVOCATE has not investigated plaintiff's complaints.

c. Had Defendant ADVOCATE investigated plaintiff's compliance hotline complaints, it would have interviewed plaintiff as part of the investigation but it has not.

d. At the time of plaintiff's October 2020 compliance hotline complaint, defendant ADVOCATE ██████████████████████████████████████

e. At the time of plaintiff's February 2021 compliance hotline complaint, defendant ADVOCATE ████████████████████████████████████

f. At the time of plaintiff's February 2021 compliance hotline complaint, defendant ADVOCATE had only given ██████████████████████████████ ████████████████████████████.

g. Had defendant ADVOCATE investigated plaintiff's hotline complaints, ADVOCATE would have discovered that selectee Z.A. was given a preferential treatment by defendants DHARIA, MATHIEU and GABRIELSON.

h. Had defendant ADVOCATE investigated plaintiff's hotline complaints, ADVOCATE would have discovered that ████. had lower qualifications and ████ ████████████████████████████.

i. Had defendant ADVOCATE discovered about ████s lower qualifications and previous ██████████████, ADVOCATE would not have executed the contract with ██████████., or would have ████████████████████████████ ██████████████████████████ but it did not.

j. Had defendant ADVOCATE investigated plaintiff's hotline complaints, ADVOCATE would have discovered the misconduct of its employees, DHARIA, MATHIEU and GABRIELSON.

k. Had defendant ADVOCATE discovered the misconducts of its employees, DHARIA, MATHIEU and GABRIELSON, ADVOCATE would have taken corrective actions on its employees.

l. Had defendant ADVOCATE discovered the misconducts of its employees, ADVOCATE would have negotiated with the plaintiff in April 2021.

129. **Defendants knew or should have known that their statements were false and intended the plaintiff to act or refrain from acting based on their statements.**

a. Defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON were continuously advertising for the job for nearly 18 months but they concealed the need for "CF Experience" in the qualification criteria at all times and even after disqualifying the plaintiff on their perceived lack of "CF Experience".

b. Defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON advertised that they were equal employment opportunity employer but they did not extend the same opportunity to plaintiff that they offered to all other applicants.

c. Defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON had no intention of ever considering the plaintiff's candidacy, however defendants made the plaintiff reapply to their job advertisements.

d. Soon after the initial "Phone Screening" by DHARIA on or around May 13, 2019, ADVOCATE, DHARIA, MATHIEU & GABRIELSON had disqualified plaintiff

and yet they induced plaintiff to forward his CV and submit himself to another "Phone Screening" interview by GABRIELSON on or around September 9, 2019.

e.  As of July 23, 2019, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON had already created beliefs in their minds that the plaintiff was aggressive and not fit for their job and yet, defendant MATHIEU made the plaintiff believe that he had an employment opportunity at ADVOCATE by introducing him to defendant GABRIELSON.

f.  As of February 2020, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON made the plaintiff believe that they were looking for a physician with more CF experience but they accepted application from an applicant who ███████████████████████████████.

g.  As of February 2020, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON made the plaintiff believe that they had suspended the search without hiring anyone and yet they ████████████████████ ███████t and without revealing their ongoing search and their changed needs for a CF experienced physician.

h.  As of August 2020, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON had solidified their beliefs that plaintiff was unfit for their advertised job at ADVOCATE due to another belief that plaintiff had aggressive behavior and yet, they induced plaintiff to apply for their re-opened search.

i.  As of August 2020, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON made the plaintiff believe that they had accepted plaintiff's re-application while in reality, they had no intention of even reading plaintiff's CV.

j.  As of August 2020, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON were p███████████████████████████████ ████████████. and they suppressed this information from the plaintiff.

k.  As of October 14, 2020, plaintiff had re-applied, shared with the defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON that he had no job, his willingness to work on a temporary contract, requesting an opportunity to chat with them and yet they willfully ignored his request for a chat, suppressed the information that they had ignored all of his previous applications and that they had no intention of even reviewing plaintiff's CV.

l.  As of October 15, 2020 at 8:25 am, defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON had not ███████████████████████ ████████████████n, were openly advertising for such positions on an internet job board called Practicelink and yet made plaintiff believe that they did not have any open positions.

m.  Defendants ADVOCATE, DHARIA, MATHIEU & GABRIELSON had multiple opportunities to correct their false beliefs and false records about the plaintiff but they did not.

n.  Defendant ADVOCATE has made false statements to this court (Exhibit 1) to induce plaintiff to believe that defendants ADVOCATE, DHARIA, MATHIEU, and GABRIELSON had legitimately denied plaintiff's application at all times.

o.  Defendants ADVOCATE, DHARIA, MATHIEU, and GABRIELSON intended plaintiff to act on their false statements by keep on re-applying for "the position"

and refrain from correcting their false beliefs, false records, false statements and false premises.

p. Defendants ADVOCATE, DHARIA, MATHIEU, and GABRIELSON intended plaintiff to believe that plaintiff was truly unqualified or unfit for employment at ADVOCATE and wanted to give up his efforts to secure employment at ADVOCATE.

q. Defendants DHARIA, MATHIEU, and GABRIELSON displayed a pervasive conduct of making false statements in order to deceive the plaintiff.

r. If the conducts of DHARIA, MATHIEU, and GABRIELSON were unintentional, they would have corrected their false beliefs, false statements and false records but they have not.

s. If the conducts of DHARIA, MATHIEU, and GABRIELSON were unintentional, they would have read plaintiff's CV and re-evaluated his candidacy when he repeatedly reapplied but they have not.

t. If the conducts of DHARIA, MATHIEU, and GABRIELSON were unintentional, they would have shared their true beliefs & their records with the plaintiff when plaintiff asked for feedback but they have not.

u. Had plaintiff known that defendants DHARIA, MATHIEU, and GABRIELSON had false beliefs and false records about plaintiff, he would have taken steps to correct their beliefs and records.

v. Plaintiff was refrained from correcting false beliefs, false statements and false records of defendants DHARIA, MATHIEU, and GABRIELSON due to

defendant DHARIA, MATHIEU, and GABRIELSON's intentional false statements and their attempts to hide such statements.

130. **Defendant ADVOCATE intended plaintiff to act on its false statement on investigating plaintiff's compliance hotline complaints.**

   a. Defendant ADVOCATE intended plaintiff to believe that it had reviewed plaintiff's application on its merit while ADVOCATE had not even reviewed plaintiff's CV to assess plaintiff's merit.

   b. Defendant ADVOCATE's Associate General Counsel Ms. Laura Liss claimed on April 7, 2021 that plaintiff's candidacy was handled appropriately in her reason for her refusal to negotiate with the plaintiff while Counsel Liss had not made any attempts to review material facts.

   c. By such claim and on account of Counsel Liss being an officer of the court through her membership of the Illinois Bar, defendant ADVOCATE induced plaintiff to believe that ADVOCATE had reviewed all material facts with regard to plaintiff's application while it had not.

   d. As of April 7, 2021, defendant ADVOCATE had received two compliance hotline complaints from the plaintiff.

   e. Had defendant ADVOCATE not intended plaintiff to act on its false statements or inducements, it would not have directed its Associate General Counsel to claim that plaintiff's candidacy was handled appropriately.

   f. Had defendant ADVOCATE not intended plaintiff to act on its false statements, ADVOCATE would not have stated it would investigate the hotline complaints.

g. Defendant ADVOCATE simply wanted plaintiff to believe that plaintiff's allegations were unsubstantiated.

h. Defendant ADVOCATE intended plaintiff to give up and not pursue any legal claim.

i. ADVOCATE was intending to ███████████████████ but had only recruited one as of April 2021.

j. Had defendant ADVOCATE not intended plaintiff to act on its false statements, it would have re-evaluated plaintiff's candidacy for the second position as part of its investigation of compliance hotline complaint, but it did not.

k. ADVOCATE has not recruited the intended second physician to this date.

l. Had ADVOCATE not intended plaintiff to act on its false statements, it would have re-evaluated plaintiff's candidacy during the pendency of this lawsuit but it has not.

m. Had ADVOCATE not intended plaintiff to act on its false statements, it would have negotiated with the plaintiff with regard to the second unfilled position but it has refused to negotiate.

n. ADVOCATE made false statements to this court when it answered plaintiff's complaint and in response to plaintiff's discovery requests ("Exhibit 1" of "Motion For Leave To Amend").

o. Had ADVOCATE not intended plaintiff to act on their false statements, ADVOCATE would have filed corrected responses but it has not.

p. Plaintiff took actions by relying on the statements of defendant ADVOCATE believing them to be true.

q.  Plaintiff applied and reapplied to defendant ADVOCATE's advertisements on multiple occasions believing his candidacy would be advanced.

r.  Plaintiff applied and reapplied to defendant's advertisements on multiple occasions believing defendants ADVOCATE, DHARIA, MATHIEU, and GABRIELSON would evaluate his candidacy in the same way they had evaluated other candidates and the selectee, Z.A.

s.  Plaintiff applied and reapplied to defendant's advertisements on multiple occasions believing defendant ADVOCATE would interview him in the same way it interviewed other candidates.

t.  Plaintiff applied for defendant ADVOCATE's job on multiple occasions believing ADVOCATE would abide by its internal policies and bylaws.

u.  Plaintiff applied for defendant ADVOCATE's job on multiple occasions believing ADVOCATE would apply its internal policies and bylaws to the plaintiff in the same way it applied to other applicants.

v.  However, ADVOCATE did not follow its internal policies and bylaws with regard to the handling of plaintiff's applications and hotline complaints.

w.  Defendant ADVOCATE induced plaintiff to believe that he would be accorded the same due process rights available to all members of its medical staff and applicants to medical staff but it denied such due process rights to the plaintiff.

x.  Defendant ADVOCATE induced plaintiff to believe that he would be accorded the same due process rights available to all other contenders to its contingent physician employment contract but it denied such due process rights to the plaintiff.

      y.   Plaintiff brought this action believing defendant ADVOCATE will make truthful statements when it answered plaintiff's complaints and in response to plaintiff's discovery requests.

131.    Plaintiff's conduct amounted to Fraud Under Illinois Common Law and plaintiff suffered monetary and non-monetary damages as direct consequence.

132.    Plaintiff is entitled for monetary damages, costs, attorney fees, equitable and injunctive reliefs.

## COUNT III: DECPTION FRAUD UNDER COMMON LAW & VIOLATION OF 815 ILCS 505/2; CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (AGAINST DEFENDANTS ADVOCATE, DHARIA, MATHIEU & GABRIELSON)

133.

134.    Plaintiff realleges and incorporates ¶¶ 1-132 of General Allegations as ¶133 of Count III

135.    Defendant ADVOCATE conducts trade or commerce as defined by 815 ILCS 505, Sec. 1 (f) wherein it advertises, sells, offers to sell, distributes, and offers to distribute the professional services of physicians, diagnostic services, therapeutic services, inpatient treatment services, hospital outpatient services, procedural services, surgical services, pharmaceutical services, laboratory services, home health services, and medical devices, henceforth collectively referred to as "Commerce".

      a.   *815 ILCS 505/2 states, "methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment,*

*suppression or omission of any material fact, with intent that others rely upon the*

*concealment, suppression or omission of such material fact, or the use or*

*employment of any practice described in Section 2 of the "Uniform Deceptive*

*Trade Practices Act", approved August 5, 1965, in the conduct of any trade or*

*commerce are hereby declared unlawful whether any person has in fact been*

*misled, deceived or damaged thereby. In construing this section consideration*

*shall be given to the interpretations of the Federal Trade Commission and the*

*federal courts relating to Section 5 (a) of the Federal Trade Commission Act".*

136.    Defendant ADVOCATE contracts with "third-party payers" to conduct its "Commerce" in which the ultimate consumers ("Consumers") are the ordinary people of the state of Illinois with healthcare needs.

137.    With or without its contracts with "third-party payers", Defendant ADVOCATE also directly contracts with the "Consumers" to conduct its "Commerce".

138.    To conduct all aspects of its "Commerce", Defendant ADVOCATE enters into agreements ("Regulatory Contracts") with several regulatory bodies of State & Federal Governments, non-governmental regulatory bodies approved by the Federal Government and certain trade or industry organizations.

139.    Without such "Regulatory Contracts", Defendant ADVOCATE cannot conduct its "Commerce". "Regulatory Contracts" set rules for the conduct of ADVOCATE's "Commerce".

140.    To conduct all aspects of its "Commerce", Defendant ADVOCATE needs the professional services of physicians.

141.    Defendant ADVOCATE cannot conduct its "Commerce" without the professional services of physicians.

142.    To conduct all aspects of its "Commerce", Defendant ADVOCATE needs a "physician order" for each billable item sold or distributed, or each service rendered or distributed, to its contracted parties.

143.    In order to procure the professional services of physicians and "physician orders", Defendant ADVOCATE enters into separate sets of complex agreements ("Physician Contracts") with physician groups and separately through every individual physician within these groups.

144.    Through these "Physician Contracts", Defendant ADVOCATE leases "physician credentials" of every contracted physician to bill for services and receive payments from "Consumers" & third party payers.

145.    "Physician Credentials" refer to the sum of, physician qualifications, experience, expertise, training, medical & controlled substance licenses issued by the state, DEA license, certificates issued by the "medical boards", peer references, criminal background checks, civil background checks, physicians' "case records", quality of physicians' prior work maintained by the medical staff organizations of each of physicians' affiliated hospitals, physicians' malpractice claims records, and disciplinary records.

146.    Defendant ADVOCATE executes "Physician Contracts" through its Medical Staff Organization ("MSO") and other internal departments which may be referred to by different names such as "Payer Enrollment" and "Coding & Billing".

147.    In order to procure the professional physician services and "Physician Orders", Defendant ADVOCATE wraps complex set of "Physician Contracts" with a layer of "Employment Agreement", to conduct its "Commerce".

148.    However, ADVOCATE compensates its physicians contracted through "Employment Agreement" based on their earnings measured by a metric called Relative Value Units (RVU's). RVU's are directly linked to the billable "Physician Orders" signed by the physicians.

149.    Annually, 

150.    Through a

151.    In the conduct of its "Commerce", Defendant ADVOCATE offers real estate, medical equipment, pharmacy, laboratory and ancillary clinical services to physicians and consumers.

152.    Defendant ADVOCATE also acts as an intermediary between the physicians on side and "Consumers" & "third-party payers" on the other side of the "Commerce".

153.    Through its size and financial power, ADVOCATE makes physicians completely dependent on it for the delivery of physicians' professional services to "Consumers".

154.    Because of its size and financial power, ADVOCATE is able to secure contracts with "third-party payers" at much higher prices than what physicians can get on their own for the same services rendered within ADVOCATE's real estate or physicians' own office.

155.    Because of its size and financial power, ADVOCATE treats its physicians and physician applicants poorly.

156.    Because of its size and financial power, ADVOCATE goes as far as influencing the behavior of its physicians through its business model.

157.    ADVOCATE goes as far as using its unqualified physician recruiters conduct behavioral assessment of its physician applicants using unvalidated methods.

158.    In its business model, ADVOCATE goes as far as not investigating complaints made to its compliance hotlines.

159.    Through its business model and compensation structure, ADVOCATE goes as far as influencing and changing the behavior of its physicians to divert all services that were traditionally offered in lower cost physician offices to higher cost ADVOCATE's facilities where the contractually allowed prices are high.

160.    By way of an example, a pediatric pulmonology procedure called "Evaluation of Wheezing" with a Current Procedural Terminology (CPT) code of 94060 was traditionally offered in physician offices. It can now be offered in patients' own homes at a lower cost. However, in ADVOCATE's service area, the test is only offered within ADVOCATE facility based laboratories at a much higher cost.

161.    With these higher prices, ADVOCATE is able to get higher income and through this higher income, support the departments such as "Physician Integration", "Talent Acquisition" and "Physician Recruitment".

162.    The prices the "third-party payers" are willing to pay ADVOCATE is linked to what Medicare is willing to pay for the same services which in turn is linked to "Medicare Cost Reports".

163.    Traditionally, Medicare sets the reimbursable prices based on, the actual costs hospitals such as ADVOCATE incur, and the cost reports submitted by the hospitals on an annual basis.

164.    ADVOCATE is one of the 10 largest not-for-profit, integrated health systems & because of its size, is able to raise the price bar of Medicare through its annual cost reporting.

165.    In other words, ADVOCATE has no incentive to reduce the cost of healthcare since it can simply pass on its increased cost to "Consumers" by way Medicare cost reporting.

166.    Plaintiff has an active social media presence where he regularly posts his views on patient centered, consumer focused, lower-cost alternatives to incumbent model of healthcare delivery systems.

167.    Many decision making administrators of ADVOCATE including DHARIA are in plaintiff's social media network where they are able to regularly read plaintiff's postings.

168.    ADVOCATE is an incumbent system accustomed to the old way of doing "Commerce" in healthcare focused on short term gains of disease management.

169.    Plaintiff has expertise in the area of using digital health tools to drive efficiency, improve care and reduce cost about which he regularly publishes his views on social media.

170.    "Remote Patient Monitoring" (RPM) is a relatively newer form of healthcare delivery model that uses digital health tools, connected portable medical devices for home use and wearable technology embedded in physician's regular workflow to proactively manage chronic medical conditions such as asthma, COPD, obesity, diabetes, and hypertension.

171.    Services rendered under RPM is not only reimbursed but encouraged by "third-party payers" since RPM helps reduce overall cost of healthcare through proactive management of health in chronic medical conditions rather than waiting until they develop complications.

172.    For physicians, RPM provides the tools to become less dependent on hospitals or large corporates and allows physicians to take some of the care to patients' homes that are currently can only be rendered within hospital facilities and at much lower cost.

173.    By way of an example, a 10-year old patient with chronic asthma on Blue Cross Blue Shield health insurance with an annual individual out of pocket expense maximum of $2500, who is typically taken care of by DHARIA's group, will have to spend $244 from their pocket, while BCBS reimburses ADVOCATE an undisclosed amount which could be as high as $2480 for each procedure with a Current Procedural Terminology (CPT) code of 94060.

174.    It is standard to perform procedures with variants of CPT code 94060 in above patient during every visit to a pediatric specialist physician to monitor their asthma and such patients are expected to have at least four visits per year.

175.    With RPM model, for about $300 of one-time payment and upon a "physician order", the above patient could purchase and own an FDA approved, clinical grade, portable medical device which performs the same functions as the device in ADVOCATE's facility used to bill for CPT code 94060. The 10-year old patient can be remotely coached on proper use of this device in patient's own home to get the same results that ADVOCATE gets but at a much lower price than what ADVOCATE charges.

176. With RPM technology, the physician will be able to remotely listen to this 10-year old patient's lungs, heart, obtain vitals, and perform pulmonary function tests all remotely in patient's own home and three out of four visits per year to the specialist can be virtually completed in patient's own home, further reducing patient's out of pocket expenses on gas and parking fees at the hospital. Patient's insurance will also save money due to fewer charges linked to facility fees.

177. RPM challenges ADVOCATE's business model which focuses on short term gains linked to high priced facility fees which comes at a higher cost to the consumers and individual physicians such as the plaintiff.

178. During DHARIA's "phone screening process" on or around May 13, 2019 and GABRIELSON's "phone screening process" on or around September 9, 2019, plaintiff shared details about his work in the area of "Remote" Patient Monitoring and his interest to introduce "Remote" Patient Monitoring model for asthma patients in Chicago where, he felt there was a great need.

179. During these "phone screening process" conversations, the plaintiff also shared how the "Remote" Patient Monitoring model helps take hospital level care to patients' own homes.

180. Plaintiff further shared that how his vision aligned with ADVOCATE leadership's advertised "commitment to an autonomous practice environment" who continuously strive to "be on the forefront of managing the changing healthcare landscape, advances in technology and innovative approaches to providing impeccable outcomes" to its patients.

181. However, GABRIELSON & DHARIA who assess the behavior of physician applicants on behalf of ADVOCATE and using ADVOCATE's "phone screening process",

saw plaintiff's interest in RPM as a threat to ADVOCATE's business model and formed a belief in their minds that the plaintiff was asking for "Remote" call coverage from Florida.

182.     Since plaintiff's proposal could disrupt ADVOCATE's business model in pediatric pulmonology market, MATHIEU, GABRIELSON & DHARIA also formed and solidified their personal beliefs that the plaintiff's behavior was somehow aggressive which was allegedly not compatible with ADVOCATE's behavioral expectations. They further helped ADVOCATE to solidify its belief on plaintiff's alleged aggressive behavior.

183.     Defendant ADVOCATE has broadly two categories of physicians and physician groups on its staff: 1) Employed and 2) Affiliated.

184.     In its conduct of "Commerce", Defendant ADVOCATE forces its "employed physicians" to refer all "Consumers" for all of their healthcare services and supplies in connection with professional physician services to entities owned or controlled by Defendant ADVOCATE.

185.     Under the category of "Employed" physicians, Defendant ADVOCATE owns a large physician group called, ADVOCATE Medical Group ("AMG") through which it procures professional physician services and "Physician Orders" for the conduct of its commerce.

186.     "AMG" procures professional services of pediatric pulmonology physicians through "Employment Agreements" and resells them to "Consumers" and third party payers bundled with ADVOCATE's facility fees based services.

187.     Virtually all professional services of pediatric pulmonology physicians offered by "AMG" are tied to higher priced facility fees.

188.     By way of an example, a procedure called "evaluation of wheezing" with a current procedural terminology (CPT) code of 94060 can be done in physician offices for which

third-party payers reimburse approximately $60-75. Third party payers reimburse at much higher rates for the same test if it is performed within a hospital facility.

189.    Upon information and belief, ADVOCATE does not offer this procedure (CPT code 94060) for children in any of its physician offices and only offers it within hospital facilities.

190.    For a "Consumer" with Blue Cross insurance, an in network price for CPT code 94060 at ADVOCATE is $2659 with an out of pocket expense of $244 for the consumer.

191.    ADVOCATE employs physician recruiters and physician leaders to assess the behaviors of physicians using unvalidated methods such as "phone screening process" employed by DHARIA.

192.    ADVOCATE uses these unvalidated behavior assessment methods to prevent physicians who are perceived to be threats to its business model, from gaining "employment contract" at ADVOCATE.

193.    In order to comply with its "regulatory contracts", ADVOCATE uses some decoy job advertisements targeting physicians in the employment market.

194.    Decoy advertisements are untruthful or misleading advertisements of job descriptions and person specifications having no relevance to the actual job being offered.

195.    For "the position", ADVOCATE used decoy job advertisements.

196.    Through its wholly owned unit "AMG", Defendant ADVOCATE began advertisements on or around May 2019 for a pediatric pulmonologist candidate "who has experience, an enthusiastic approach to providing care for children and a passion for teaching pediatric residents and medical students in clinical outpatient and hospital settings".

197.     Throughout 2019 and until October 2020, Defendant ADVOCATE continued the same advertisement.

198.     Defendant ADVOCATE publicly advertised that it needed the expertise of physicians to meet the demands of satellite clinics, highly complex inpatient service, and expected growth in the programs of "PFT, Bronchs, Multidisciplinary Clinic".

199.     In its public advertisement, Defendant ADVOCATE claimed that the responsibilities for the new recruit would include, "daily rounds, clinics, program development, faculty development and clinical research".

200.     In its public advertisement, Defendant ADVOCATE claimed that the "experience in and desire to grow" qualities in the applicant "would have added value" to its need.

201.     Plaintiff met all publicly advertised needs of Defendant ADVOCATE when he applied for this job in May 2019, June 2019, July 2019, September 2019, February 2020, August 2020, October 2020 and March 2021.

202.     In its public advertisement, Defendant ADVOCATE claimed that their team was committed to providing "evidence based, compassionate care".

203.     Plaintiff's CV clearly displayed enough facts to convey to a reasonable physician or a physician recruiter using an "evidence based, compassionate care" approach that the plaintiff had superior qualifications, experience & expertise in comparison to the selectee.

204.     In addition to publicly published advertisements, Defendant ADVOCATE used Defendants DHARIA, MATHIEU and GABRIELSON for private, direct advertisements to prospective applicants for its advertised post.

205.     In February 2020, claiming that it had a need for a "CF experienced" pediatric pulmonologist, ADVOCATE eliminated plaintiff from its applicant pool and yet refused to consider the "evidence" of plaintiff's "CF experience", evident in plaintiff's CV.

206.     Defendants ADVOCATE, MATHIEU, GABRIELSON and DHARIA concealed, suppressed, and omitted their alleged need for a "CF experienced" pediatric pulmonologist in all of their public and private advertisements, telephone interviews and email communications with the plaintiff.

207.     The concealment, suppression, and omission of facts by Defendants DHARIA, MATHIEU and GABRIELSON amounted to "Deception" and violation of section 2 of 815 ILCS 505 (Consumer Fraud and Deceptive Business Practices Act).

208.     Defendants DHARIA, MATHIEU and GABRIELSON knew or should have known that plaintiff would rely on their deceptive advertisements and that the plaintiff would be prejudiced by their concealed, suppressed, and omitted material facts about their alleged need for a "CF experienced" pediatric pulmonologist.

209.     Defendants DHARIA, MATHIEU and GABRIELSON intended plaintiff to rely on the concealed, suppressed, and omitted material facts in their advertisements made to the plaintiff.

210.     Plaintiff relied on the published material and believed them all to be true and plaintiff had no access or could not have had access to the suppressed or concealed information about ADVOCATE's alleged need for "CF experienced" physician.

211.     Defendants DHARIA, MATHIEU and GABRIELSON concealed, suppressed, and omitted material facts relating to their alleged need for a "CF experienced" pediatric pulmonologist with the sole intent to eliminate the plaintiff from their applicant pool.

212.     On or around October 10, 2019, Defendants GABRIELSON, MATHIEU and

DHARIA emailed plaintiff that they did not hire him for his alleged lack of "CF

experience" but in the same email, promised to keep the plaintiff in mind for any future

openings.

213.     On February 11, 2020, GABRIELSON emailed plaintiff that they had not hired

anyone else for their position yet but were re-evaluating the need for the position,

misleading the plaintiff that ADVOCATE had stopped their search.

214.     Seven days later ███████████████, Defendant DHARIA,

GABRIELSON, MATHIEU and ADVOCATE ██████████████████

████████████████.

215.     On or after February 18, 2020, Defendant DHARIA, GABRIELSON, MATHIEU

and ADVOCATE removed their alleged need for a "CF experienced" pediatric

pulmonologist so as to favor and ████████████████

216.     On or around February 18, 2020, GABRIELSON, DHARIA, MATHIEU, and

ADVOCATE reopened their search but did not consider plaintiff's application contrary

to their prior promise.

217.     ADVOCATE had advertised that the "qualified candidates will have completed

an American Board of Pediatrics (ABP) accredited fellowship in Pediatrics and

Pulmonary and B.E. or B.C. in this subspeciality". ████████████████

████████████████████████████████

████████████████

218.     Through false pretense, misrepresentation, concealment, suppression, and omission of material facts, Defendant ADVOCATE, Defendants DHARIA, MATHIEU and GABRIELSON rejected plaintiff at all times and selected Z.A.

219.     In their deception, DHARIA, MATHIEU and GABRIELSON formed false beliefs and committed defamation per se of the plaintiff stating that he had an aggressive behavior lacking ability or integrity in the performance of job duties at ADVOCATE.

220.     Defendant ADVOCATE allowed DHARIA, MATHIEU and GABRIELSON to commit defamation per se, relied on the information derived from defamation per se and failed to investigate plaintiff's internal complaints in perpetuating deception.

221.     Specifically, on or around September 6, 2019, Defendants DHARIA and GABRIELSON believed that plaintiff's out of state family would interfere with his ability to render his professional services for their "Commerce" activities but refused to share those beliefs in the subsequent feedback shared with the plaintiff.

222.     Defendants DHARIA & GABRIELSON employed deception fraud with the intent that other administrators within Defendant ADVOCATE rely on such false pretense, false promise, misrepresentation, concealment, suppression, and omission of material facts about plaintiff, solely to deny the employment opportunity for the plaintiff.

223.     Defendant ADVOCATE knew or should have known about the deception fraud employed by Defendants DHARIA, MATHIEU & GABRIELSON and yet failed to take corrective action.

224.     Defendant DHARIA violated Sec. 2 (a) (7) (8) (9) (10) & (12) of IL Uniform Deceptive Trade Practices Act 815 ILCS 510 in defrauding the plaintiff through deception.

225.    Uniform Deceptive Trade Practices Act 815 ILCS 510 Sec. 2 (a)

    a.  (7) represents that goods or services are of a particular standard, quality, or grade
        or that goods are a particular style or model, if they are of another

    b.  (8) disparages the goods, services, or business of another by false or misleading
        representation of fact;

    c.  (9) advertises goods or services with intent not to sell them as advertised;

    d.  (10) advertises goods or services with intent not to supply reasonably expectable
        public demand, unless the advertisement discloses a limitation of quantity;

    e.  (12) engages in any other conduct which similarly creates a likelihood of
        confusion or misunderstanding.

226.    Specifically, by casting aspersion on plaintiff's behavior, Defendant DHARIA
represented to Defendant ADVOCATE that the services of the plaintiff were of poor
quality while they were in fact superior and █████████████████████████████
███████████████████.

227.    Defendant DHARIA disparaged the services or business of plaintiff by false and
misleading representation of fact.

228.    In the aid of her and Defendant ADVOCATE's "Commerce", defendant
DHARIA represented to the "Consumers" that she would be offering services to her child
"Consumers" with lung disease in a timely manner which is a reasonably expectable
public demand, while in reality, even the telephone calls of her "Consumers" were not
being answered.

229.    In her efforts to procure the professional services of a physician to conduct the
"Commerce" and service "Consumers", Defendant DHARIA deliberately engaged in a

conduct of creating confusion and misunderstanding in her repeated advertisements or formation of beliefs.

230.     Defendants' fraud is intended to deceive 1) Physicians seeking employment opportunities, 2) "Consumers" who in this case are children with lung diseases and 3) Third party payers.

231.     Defendants deceive physicians seeking employment opportunities by giving false hope to applicants while they only hire non-assertive physicians who can be underpaid and manipulated. ███████████████████ per their own standards, while ████████████████████████████████████████ ███████████████████████████".

232.     Defendants deceive "Consumers" by hoarding their professional service contracts with third-party payers.

233.     Defendants deceive third-party payers by forcing them to use defendant's ala carte, facility fee based high priced services through anticompetitive conduct.

234.     Defendant's parent company, ADVOCATE Aurora Health Inc. is being sued by a third party payer, Uriel Pharmacy Health and Welfare Plan (Uriel) in US District Court Eastern District of Wisconsin (Case No. 2:22-cv-00610) for forcing Uriel to use defendant ADVOCATE's high priced services.

235.     By such deception, defendants are able to drive waste and abuse of healthcare dollars which funds the compensation of administrative class and physician recruiters in their hospitals.

236.     By such deception, consumers are harmed due to non-availability of lower cost services such as Remote Patient Monitoring that plaintiff would have introduced at ADVOCATE.

237.     Plaintiff has suffered damages proximately resulting from Defendants' deceptive actions in the forms of lost wages, other employment benefits, emotional distress, and other consequential losses. The violation entitles Plaintiff to economic damages, injunctive relief and attorney fees.

**COUNT IV – DISCRIMINATION UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT ("ADEA") (AGAINST DEFENDANT ADVOCATE)**

238.

239.     Plaintiff realleges and incorporates ¶¶ 1-237 of General Allegations as ¶238 of Count IV

240.     Plaintiff applied for the Position and similar positions several times and has been fully qualified in meeting their requirements.

241.     Nevertheless, Defendant ADVOCATE has refused to hire Plaintiff, and hired an individual with less experience, less qualifications, ███████████████████████████ ████████████████████████████████.

242.     Defendant ADVOCATE maintains a structurally and systematically discriminatory culture through its "Phone Screening" process and failure to investigate compliance hotline complaints.

243.     By design, the "Phone Screening" process disqualifies older applicants and qualifies only younger applicants for Pediatric Pulmonology.

244.     By design, ADVOCATE's handling of compliance hotline complaints conceals unlawful discrimination occurring under the "Phone Screening" process.

245.     Defendant ADVOCATE's actions constitute a violation of ADEA.

246.     Defendant ADVOCATE's actions have caused Plaintiff lost wages and other employment benefits, and significant emotional distress.

247.     At all relevant times, ADVOCATE's actions were willful and wanton, entitling Plaintiff to an award of punitive damages.

## COUNT V – DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT ("ADA") (AGAINST DEFENDANT ADVOCATE)

248.

249.     Plaintiff realleges and incorporates ¶¶ 1-247 of General Allegations as ¶ 248 of Count V.

250.     Plaintiff was a "qualified individual" under the ADA.

251.     On information and belief, Defendant knew about his disabilities.

252.     Plaintiff applied for the Position and similar positions several times and has been fully qualified in meeting their requirements.

253.     Nevertheless, Defendant has refused to hire Plaintiff, and hired an individual with less experience, less qualifications, ███████████████████████████ ████████████████████████████.

254.     By design, the "Phone Screening" process disqualifies disabled applicants and qualifies only non-disabled applicants for Pediatric Pulmonology.

255.     By design, ADVOCATE's handling of compliance hotline complaints conceals unlawful discrimination occurring under the "Phone Screening" process.

256.     Defendant's actions constitute a violation of ADA.

257.     Defendant's actions have caused Plaintiff lost wages and other employment

benefits, and significant emotional distress.

258.     At all relevant times, ADVOCATE's actions were willful and wanton, entitling

Plaintiff to an award of punitive damages.

## COUNT VI – RETALIATION UNDER TITLE VII (AGAINST DEFENDANT ADVOCATE)

259.

260.     Plaintiff realleges and incorporates ¶¶ 1-258 of General Allegations as ¶ 259 of

Count VI.

261.     Plaintiff engaged in a protected activity under Title VII by filing a charge of

discrimination against UofC & a former employer in Florida.

262.     On information and belief, Defendant learned about Plaintiff's protected activity.

263.     Plaintiff applied for the Position and similar positions several times and has been

fully qualified in meeting their requirements.

264.     Nevertheless, Defendant has refused to hire Plaintiff, and hired an individual with

less experience, less qualifications, ███████████████████████████████

███████████████████████████████ .

265.     By design, the "Phone Screening" process disqualifies applicants who have

previously filed discrimination charges and qualifies only applicants who have not

previously filed discrimination charge, for Pediatric Pulmonology.

266.     By design, ADVOCATE's handling of compliance hotline complaints conceals

unlawful discrimination occurring under the "Phone Screening" process.

267.     Defendant's actions constitute a violation of Title VII.

268.     Defendant's actions have caused Plaintiff lost wages and other employment

benefits, and significant emotional distress.

269.     At all relevant times, ADVOCATE's actions were willful and wanton, entitling

Plaintiff to an award of punitive damages.

## COUNT VII - RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT (AGAINST DEFENDANT ADVOCATE)

270.

271.     Plaintiff realleges and incorporates ¶¶ 1-269 of General Allegations as ¶270 of

Count VII.

272.     Plaintiff engaged in a protected activity under the ADA by filing a charge of

discrimination against UofC.

273.     ADVOCATE became aware of Plaintiff's protected activity through its

relationship with UofC and/or due to the information being freely accessible in the public

domain.

274.     Plaintiff applied for the Position and similar positions several times and has been

fully qualified in meeting their requirements.

275.     Nevertheless, Defendant has refused to hire Plaintiff, and hired an individual with

less experience, less qualifications, ███████████████████████████████

███████████████████████████.

276.     By design, the "Phone Screening" process disqualifies applicants involved in

protected activities under the ADA and qualifies only those applicants not involved in

protected activities under the ADA, for Pediatric Pulmonology.

277.     By design, ADVOCATE's handling of compliance hotline complaints conceals unlawful discrimination occurring under the "Phone Screening" process.

278.     ADVOCATE's actions constitute a violation of ADA.

279.     Defendant's actions have caused Plaintiff lost wages and other employment benefits, and significant emotional distress.

280.     At all relevant times, ADVOCATE's actions were willful and wanton, entitling Plaintiff to an award of punitive damages.

**WHEREFORE**, Plaintiff requests that this Court enter a judgment in Plaintiff's favor and against Defendants, and that Plaintiff be awarded the following relief:

A.     Backpay, pre-judgment interest, and remedy for any negative tax consequences from an award of a lump sum payment;

B.     Compensatory damages;

C.     Punitive Damages;

D.     Treble Damages;

E.     Granting equitable tolling on claims which defendants may seek to bar on statutes of limitations.

F.     Enjoining defendants from using "the phone screening" in the physician recruitment process;

G.     By ordering defendant ADVOCATE to investigate plaintiff's compliance hotline complaints or in the alternative, allow plaintiff to investigate through discovery.

H.     By enjoining defendants DHARIA, MATHIEU, and GABRIELSON from participating in any physician recruitment process.

I.     By ordering the defendants to hire plaintiff for their unfilled second position;

J.     Attorneys' Fees and Costs; and

K.     Such other and further relief as this court deems appropriate.

Dated: July 25, 2022            *Respectfully submitted,*

                                  */s/ Satyanarayan Hegde*
                               SATYANAYARAN HEGDE acting Pro Se

Satyanarayan Hegde, M.D.
1505, Fort Clarke Blvd, #9204
Gainesville, FL 32606
Tel: (620) 332-6392
satyamrith@gmail.com